UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

EXEL INC.,
d/b/a DHL SUPPLY CHAIN,

        Plaintiff,

v.

XPEDIENT ANAGEMENT GROUP, LLC,
d/b/a XPEDIENT LOGISTICS, et al.,

        Defendants.

Case No. 2:17-cv-1076
**CHIEF JUDGE EDMUND A. SARGUS, JR.**
**Magistrate Judge Elizabeth Preston Deavers**

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Application for a Temporary Restraining Order ("TRO") (ECF No. 10), on which this Court took evidence and oral argument at two in-court hearings and on brief, and Defendants' Motion to Dissolve the State Court TRO (ECF No. 6). For the reasons set forth below and on the record at the hearings on this matter, the Court **DENIES** Plaintiffs' Motion and **DENIES AS MOOT** Defendants' Motion.

## I.

### A.    Procedural Background

On December 6, 2017, Plaintiff Exel Inc. d/b/a DHL Supply Chain ("Plaintiff" and/or "DHL") filed this case in the Delaware County Ohio, Court of Common Pleas. (ECF No. 1-1.) On that same day, the state court issued an *ex parte* TRO in favor of DHL and scheduled a preliminary injunction hearing for December 20, 2017, the date on which the TRO would expire. (ECF No. 1-8.)

On December 12, 2017, Defendants Xpedient Management Group, LLC ("Xpedient"), John Curry, and John White (together "Defendants") removed the case to this Court. (ECF No. 1.) On December 14, 2017, Defendants filed a Motion to Dissolve the State Court TRO. (ECF No. 6.) The Court held a telephone conference on December 15, 2017 (ECF No. 4), at which it scheduled a hearing for December 18, 2017, to address Plaintiff's request to have this Court enter a TRO before the expiration of the state court TRO (ECF No. 7).

On December 18, 2017, the Court held an all-day hearing on Plaintiffs' request for a TRO ("TRO Hearing"). (ECF No. 11.) At the TRO Hearing, the Court extended the dissolution date of the state court TRO from December 20, 2017 to December 22, 2017, directed the parties to file simultaneous briefs on the matter, and scheduled a final hearing for December 22, 2017 ("Final TRO Hearing"). (ECF No. 12.)

The parties filed their post hearing briefs on December 21, 2017. (Defs.' Post Hearing Brief, ECF No. 16; Pl.'s Post Hearing Brief, ECF Nos. 17, 18[1].) Plaintiff combined its response in opposition to Defendants' Motion to Dissolve the State Court TRO with its post-hearing TRO brief. On December 22, the Court held the Final TRO Hearing at which it took oral argument on the TRO briefing. (ECF No. 20.). At the Final TRO Final Hearing, the Court denied Plaintiff's request for a TRO (ECF No. 21), which rendered moot Defendants' request to dissolve the state court TRO. This opinion supplements and memorializes the Court's decision. (Final TRO Hearing Tr., ECF No. 23.)

---

[1] Plaintiff first filed its brief under seal pursuant to this Court's order granting it permission to do so. (ECF No. 17.) Plaintiff then filed a redacted version of its brief in accordance with this Court's Local Rules. (ECF No. 18.)

**B.     Undisputed Relevant Facts**

Mr. Curry worked at DHL from February 1, 2006, through July 12, 2015. During his employment at DHL, Mr. Curry served as General Manager of the DHL-managed Discount Tire warehouse in California from 2007 to 2009, Director of Operations from 2009 to 2011, and Senior Director of Operations from 2011 to 2014.

In June 2014, Mr. Curry was promoted to Vice President in DHL's Automotive Sector. Mr. Curry had primary responsibility for DHL's accounts with Discount Tire, Chrysler/Fiat, and Nissan. At the time of the promotion, Mr. Curry signed an Employment Agreement with various restrictive covenants, including non-competition and non-solicitation provisions. (Emp't Agreement, Compl. Ex. 1, ECF No. 1-1.)

In December 2014, Mr. Curry informed DHL's President of its Automotive Sector, Mark Kunar, that he was planning to leave his employment with DHL. Mr. Kunar asked Mr. Curry to stay, which he did. In February 2015, Mr. Curry approached Mr. Kunar again and told him that he was leaving DHL. Mr. Kunar asked Mr. Curry to stay until a replacement was found. When no replacement had been found, Mr. Curry terminated his employment with DHL on July 12, 2015.

**C.     Emergency Injunctive Relief Request**

Plaintiff moves this Court for a TRO that would enjoin Defendants from "soliciting DHL's customers and competing against DHL in violation of applicable Non-Solicitation and Non-Competition Covenants in Mr. Curry's Employment Agreement with DHL, and from any further unauthorized use, disclosure, dissemination, or actual or threatened misappropriation of DHL's trade secrets, including DHL's confidential bid materials [("Discount Tire Supplemental Bid")] that DHL submitted to one of its customers for a pending contract for tire supply

3

chain management services relating to a new warehouse facility in Dallas, Texas, for which DHL

and Defendants are competing ." (Proposed TRO, ECF No. 17-1.) DHL argues that there are

two independent reasons why the Court should issue a TRO against Defendants:

> (1) Defendants' recent misappropriation of Plaintiff [DHL's] confidential
> [Discount Tire Supplemental Bid] in connection with a pending contract for the
> new tire facility in Dallas, Texas for which DHL and Defendants are competing.

> (2) Defendants' improper solicitation of DHL's long-standing customer,
> Continental Tire, and direct competition against DHL within the Restricted Period
> under Defendant Curry's Non-Solicitation and Non-Competition Covenants with
> DHL and their continuous violation of those restrictive covenants through today.

(Pl.'s Post Hearing Brief, ECF No. 17 at 1.)

## II.

This case is before the Court on diversity jurisdiction. "Under the *Erie* doctrine, federal

courts sitting in diversity apply the substantive law of the forum state and federal procedural

law." *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (citing *Erie R. Co. v.

Tompkins,* 304 U.S. 64 (1938)). When interpreting contracts in a diversity action, the courts of

the Sixth Circuit "also generally enforce the parties' contractual choice of governing law."

*Savedoff v. Access Group, Inc.*, 524 F.3d 754, 762 (6th Cir. 2008). Mr. Curry's Employment

Agreement provides that Ohio law applies. (Emp't Agreement § 6(f), Compl. Ex. 1, ECF No. 1-

1.)

In determining whether to issue a temporary restraining order, this Court must consider

"(1) whether the movant has a 'strong' likelihood of success on the merits; (2) whether the

movant would otherwise suffer irreparable injury; (3) whether issuance of a preliminary

injunction would cause substantial harm to others; and (4) whether the public interest would be

served by issuance of a preliminary injunction." *Summit County Democratic C. and Exec.

Comm. v. Blackwell*, 388 F.3d 547, 550–51 (6th Cir. 2004) (quoting *Leary v. Daeschner,* 228

4

F.3d 729, 736 (6th Cir. 2000)). These elements are not prerequisites, but are factors that are to be balanced against each other. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 347 (6th Cir. 1998). "A district court is required to make specific findings concerning each of the factors unless fewer are dispositive of the issue." *Performance Unlimited v. Questar Publishers, Inc.,* 52 F.3d 1373, 1381 (6th Cir. 1995) (citation omitted). A preliminary injunction is an extraordinary remedy that should be granted only if the movant carries its burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington-Fayette Urb. County Govt.,* 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary,* 228 F.3d at 739).

In the instant action, the Court underweights factors three and four. *See Patio Enclosures, Inc. v. Herbst*, 39 Fed. Appx. 964, 969–70 (6th Cir. 2002) ("In its balancing of the four factors involved in the decision whether to grant a preliminary injunction, the district court underweighted factors three and four, 'substantial harm to others' and 'public interest.' This was entirely appropriate."). Substantial harm to others would not be a factor on the facts before the Court if Plaintiff meets its burden of showing irreparable harm and that there is a strong likelihood that it will succeed on the merits of the claims upon which it moves for injunctive relief. Likewise, the public interest would not be served if that kind of irreparable harm alleged here were not remedied. *Id*. (explaining that "the public generally may have an interest in seeing that reasonable non-compete covenants are enforced," yet noting that the public interest may also "best be served by allowing a successful salesman to continue performing his trade"). Consequently, the first two elements of the emergency injunctive relief analysis are dispositive of the issue, and are therefore the focus of this Court's, and the parties', analysis.

## III.

The first basis upon which Plaintiff DHL moves for a TRO is Defendants' alleged misappropriation of DHL's Discount Tire Supplemental Bid, which Plaintiff maintains violates Ohio's Uniform Trade Secrets Act.

### A.    Testimony

DHL and Xpedient are currently competing for a contract with one of DHL's long-standing customers, Discount Tire, at a new warehouse facility near Dallas, Texas. (Tr. at 13, 72–73 , 75 (Curry); Tr. at 98 (Lutwen).)[2] This new facility will replace Discount Tire's nearby warehouse facility in Grand Prairie, Texas, where DHL is currently under contract with Discount Tire for supply chain management services. (Tr. at 105–06, 110, 120 (Lutwen).) DHL submitted its initial bid in May 2017. (Tr. at 112 (Lutwen).) Xpedient submitted its bid in July 2017. (Tr. at 13 (Curry).)

After receiving the first-round bids, Discount Tire requested a supplemental bid from DHL to address specific technological and staffing issues. (Tr. at 112 (Lutwen).) In response, DHL's bid team prepared the Discount Tire Supplemental Bid, a 73-page document titled "Discount Tire Supply Chain Strategy." (Pl.'s TRO Hearing Ex. 9.) DHL marked every substantive page of the Discount Tire Supplemental Bid as "CONFIDENTIAL AND PROPRIETARY." (Pl.'s TRO Hearing Ex. 9; Tr. at 106 (Lutwen).) It did not distribute the Bid to any person outside of DHL, other than its customer, Discount Tire, subject to confidentiality restrictions. (Tr. at 92–94, 101, 178 (Lutwen).) Mr. Lutwen testified that DHL and Discount Tire have confidentiality agreements, pursuant to which each side agrees to keep confidential the

---

[2] All citations noted "Curry" and/or "Lutwen" are to the transcript of testimony provided at the TRO Hearing by Defendant John Curry and/or DHL's President of the North American Automotive Division Dennis Lutwen. (ECF No. 14).

other's technological and proprietary information, staffing, methods, and processes for their mutual operations – the same information that is contained in DHL's Bid Proposal. (Tr. at 92–94, 178 (Lutwen).)

Mr. Lutwen also testified that, based on the more than 100 competitive bidding processes in which he has been involved during his career in the supply chain management and logistics business, it is standard practice and custom in the industry that bid proposals are kept confidential and not shared with any competing bidders. (Tr. at 94–95 (Lutwen).) Mr. Curry too could not recall any time while working at DHL that he was privy to a competitor's bid. (Tr. at 12–13 (Curry).) When questioned about whether there is customarily confidential information in bid proposals, Mr. Curry testified as follows:

> Q. Would you have any reason not to share [Xpedient's bid proposal] it with DHL?
>
> A. I mean, I don't think it's something that we would go out of our way to share. I mean, there was certainly some solution design things that we would not openly share with competitors.
>
> Q. In your bid proposal?
>
> A. Yes.
>
> Q. And you would expect DHL's bid proposal to also contain confidential competitive information that it would not want to share with its competitors, correct?
>
> A. Correct.

(Tr. at 13 (Curry).)

The same month that DHL submitted the Discount Tire Supplemental Bid, an employee at Discount Tire supplied at least some redacted portions of it to Mr. White who shared it with Mr. Curry. (Tr. at 48–53 (Curry).) Mr. Curry testified that he did not disclose the Bid to anyone. (Tr. at 49 (Curry).) However, DHL presented testimony of a high ranking manager at DHL,

Daniel Bilbao, who stated that he was "100 percent" sure that Mr. Curry showed him on his smart phone a portion of the Organizational Chart that was on page 3 of the Discount Tire Supplemental Bid. (Tr. at 12, 16–17 (Bilbao)[3]; Pl. TRO Hearing Ex. 9.) For purposes of this emergency proceeding, the Court credits Mr. Bilbao's testimony. He recalled that the Organizational Chart showed that DHL was replacing Bilbao as the General Manager for Discount Tire's Grand Prairie, Texas facility and was substituting another DHL employee. (Tr. at 12 (Bilbao).) Mr. Curry suggested that Mr. Bilbao leave his employment at DHL and join Xpedient. (Tr. at 13–14 (Bilbao).)

There was no evidence presented reflecting that Xpedient utilized the information it had from the Discount Tire Supplemental Bid at any time other than his meeting with Mr. Bilbao. Nor was there testimony specifying what other unredacted portions of the Bid were in Mr. Curry's possession except for the Organizational Chart discussed *supra*.

**B.    Analysis**

Ohio's Uniform Trade Secrets Act provides that "[a]ctual or threatened misappropriation [of trade secrets] may be enjoined." Ohio Rev. Code § 1333.62(A). Because the statute does not prescribe criteria for issuing the injunction, "the general equitable principles governing the issuance of injunctive relief" apply. *Procter & Gamble Co. v. Stoneham*, 140 Ohio App. 3d 260, 268 (Ohio Ct. App. 1st Dist. 2000). Ohio courts have therefore required plaintiffs to carry the burden of showing emergency injunctive relief is appropriate. *Hydrofarm, Inc. v. Orendorff*, 180 Ohio App. 3d 339, 347 and n.3 (Ohio Ct. App. 10th Dist. 2008).

---

[3] All citations referenced by "Bilbao" are from the testimony given at the TRO Hearing by Daniel Bilbao, DHL's General Manager for Discount Tire's facility in Grand Prairie, Texas. (ECF No. 15.)

1. **Strong Likelihood of Success on the Merits**

This Court has explained that "[t]o obtain an injunction to preclude misappropriation of trade secrets under Ohio's Uniform Trade Secrets Act, [a plaintiff] must show that there was actual or threatened misappropriation of its trade secrets." *Ak Steel Corp., v. Miskovich*, 1:14CV174, 2014 WL 11881029, at *4 (S.D. Ohio Apr. 17, 2014) (citing Ohio Rev. Code. § 1333.61, *et seq*.). Under Ohio Revised Code § 1333.61(D), a "trade secret" is defined as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio courts also utilize a six-factor test to determine whether a trade secret exists. *Ak Steel Corp.,* 2014 WL 11881029, at *5 (citing *State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St. 3d 396, 399 (2000)). Those six factors include:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. Besser*, 89 Ohio St. 3d at 400 (citing *State ex rel. The Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 524–25 (1997).

DHL presented testimony that the portions of the Discount Tire Supplemental Bid that Mr. Curry was given contained DHL's organizational chart, which is found on page 3 of the Bid.

Mr. Lutwen testified, and the Court credits his testimony, that "[t]he sensitivity, in [his] mind, of this information isn't necessarily maybe the exact org[anizational] structure, but it is the names and some of the changes [DHL is] making in the network to further enhance [its] capabilities for Discount Tire." (Tr. at 105 (Lutwen).) Mr. Lutwen further explained that the organizational chart that was provided to Discount Tire for positions that were to be filled and that were not in existence at that time. He believed this is significant because it described "the management team that will run that crossdock and ensure an effective transition from the old operations to the new operations without supply chain disruption for Discount Tire." (Tr. at 106 (Lutwen).)

While the Court recognizes, as well as did the parties, that Mr. Curry should not have been privy to the Discount Tire Supplemental Bid, the evidence before the Court reflects that the portions of the Bid that were in Mr. Curry's possession displayed staffing of high ranking managers who were already known to Mr. Curry. There was no testimony that the portions of the Discount Tire Supplemental Bid that were in the possession of Mr. Curry contained unknown customer names, unknown employee names (similar to what a staffing agency may have), account numbers, pricing information, or specific information about proprietary systems described in the Bid, and do not appear to be of the same quality that Ohio Courts have found protectable as trade secrets.

For example, the Ohio Supreme Court affirmed the Public Utility Commission of Ohio's determination that portions of side agreements between electric utility and several large customers contained the following trade secret information:

> (1) customer names, (2) account numbers, (3) customer Social Security numbers or employer identification numbers, (4) contract termination dates or other termination provisions, (5) financial consideration in each contract, (6) price of generation specified in each contract, (7) volume of generation covered by each contract, and (8) terms under which any options may be exercisable.

*Ohio Consumers' Counsel v. Pub. Util. Comm.*, 121 Ohio St. 3d 362, 369 (2009).

Similarly, this Court has found that information relating to employer's customer lists, pricing information, sales strategies and business philosophy amounted to trade secrets under Ohio law, where information was only provided to employees with limited access. *Avery Dennison Corp. v. Kitsonas,* 118 F.Supp.2d 848, 854 (S.D. Ohio 2000).

Thus, the Court makes a preliminary provisional finding based upon the state of the record before it that DHL has not met its burden to show that the portions of the Discount Tire Supplemental Bid that was given to Mr. Curry contains trade secrets. Accordingly, whether Plaintiff has shown a strong likelihood of success on the merits weighs in favor of denying DHL's request for emergency injunctive relief.

### 2.     Irreparable Harm

DHL contends that Xpedient's possession of the Discount Tire Supplemental Bid, which "is one of DHL's trade secrets, and gives Defendants an unfair competitive advantage over DHL not only for the Discount Tire Contract, but also for other future bids and contracts in the tire supply chain management industry." (Pl.'s Post Hearing Brief at 6, ECF No. 17.) DHL argues that "Defendants' misappropriation of DHL's confidential Bid Proposal for the Discount Tire Contract has tainted the entire bidding process in which DHL and Defendants are competing." *Id*. at 10. DHL continues, stating "Courts hold that where, as here, a competitor has obtained another competitor's confidential bid proposal, the competitor who has obtained the bid proposal not only should be enjoined from using the trade secret, but also should be enjoined from pursuing the bid for that project." *Id*. Finally, DHL contends that, there is a threat of immediate irreparable injury for which it has no adequate remedy at law because Mr. Curry will inevitably use the confidential information that he gained while employed at DHL. DHL's arguments are not well taken.

First, as the Court indicated *supra*, at this juncture it is unclear whether there are trade secrets contained in the portions of the Discount Tire Supplemental Bid that is in Xpedient's possession. While there was testimony that Mr. Curry received redacted portions of the Bid, there was not testimony as to what portions of the bid were unredacted. To the extent that the Discount Tire Supplemental Bid does contain trade secrets, it is still DHL's burden to "demonstrate that the danger of misappropriation in this case threatens irreparable harm. Actual irreparable harm is usually not presumed, but instead must be proved." *Hydrofarm, Inc. v. Orendorff*, 180 Ohio App. 3d 339, 346 (citing *Levine,* 48 Ohio App.3d 24, paragraph four of the syllabus, (Ohio Ct. App. 10th Dist. 1988)).

As to this inquiry, DHL relies upon several cases to support its position that Xpedient should be enjoined from pursuing the Discount Tire contract. Those cases, however, are inapposite. That is, unlike the situation in the instant action where the alleged confidential information was obtained *after* the ex-employee, Mr. Curry, submitted a competing bid, in each of the relied-upon cases the confidential bid proposal was in the possession of the ex-employee *before* that person offered a competing bid. *See e.g., Roll Systems, Inc. v. Shupe*, 1998 WL 1785455 (D. Mass. Jan. 22, 1998) (former employee of plaintiff Roll who was now working for one of Roll's competitors, had possession of Roll's final proposal package for several open bids, which Roll had treated as confidential, was enjoined from contacting any of Roll's customers concerning those Project bids).

In the main case upon which DHL relies, *Orion Marine Construction, Inc. v. Coyle*, 2017 WL 4875596 (S.D. Tex. Oct. 26, 2017), an employee ("Coyle") left Orion Marine Construction's employment and emailed himself numerous documents related to his employer's communication with Target, which was one of its customers. "[A] number of the documents that Coyle emailed

to himself on the Target Projects are confidential and proprietary, including bid proposals, draft agreements, email communications with project developers, surveys, budgets, drawings, images, and topographical data." *Id*. at *5. After Coyle joined another company, Crosby, he began pursuing Target's business. The court noted that "[a]lthough Coyle avers that he did not collect these files for an improper purpose, he admits that he is now pursuing the Target Projects on behalf of Crosby and will receive a 1% commission if Crosby's bid wins." *Id*.

Contrarily, in the case *sub judice*, there is no dispute that Mr. Curry obtained the alleged trade secret information after he bid on the Continental Tire contract. Thus, there is no testimony to support any inference that Xpedient has used the information contained in the Discount Tire Supplemental Bid to compete with DHL.

Second, DHL urges the Court to apply the inevitable disclosure doctrine:

> "Courts applying the inevitable disclosure doctrine have recognized that when employees have intimate knowledge of their employer's confidential business information and trade secrets, it is virtually impossible for those employees to leave the company and work for a competitor, but compartmentalize their knowledge and avoid using their former employer's confidential business information and trade secrets at their new job." *Polymet Corp. v. Newman*, 2016 WL 4449641, *4 (S.D. Ohio 2016) (applying Ohio law).

(Pl.'s Post Hearing Brief at 11–12, ECF Nos. 17.) To the extent that the doctrine applies,[4] it does not alone work to show irreparable harm. As the *Hydrofarm* court explained: "Although the

---

[4] It is unclear whether Mr. Curry's Employment Agreement was tolled so that it was in effect at the time of the alleged misappropriation of the Discount Tire Supplemental Bid. In Ohio, whether there is an enforceable noncompetition agreement arguably impacts the availability of the inevitable disclosure doctrine. *See Hydrofarm,* Ohio App. 3d at 344, 348 ("Neither this court nor the Supreme Court of Ohio has applied the inevitable-disclosure doctrine in a case that did not involve an enforceable noncompetition agreement[,] . . .[and] "[i]n cases in which courts have enforced the inevitable-disclosure doctrine in absence of a noncompetition agreement, the former employee possessed timely, sensitive, strategic, and/or technical information that, if it was proved, posed a serious threat to his former employer's business or a specific segment thereof).

Ohio Trade Secrets Act permits injunction of threatened misappropriation of trade secrets, the usual elements for an injunction must be proved . . . even when the plaintiff seeks to invoke the inevitable-disclosure doctrine to enjoin a former employee's employment with a competitor." 180 Ohio App. 3d at 346–47. Here, the record contains no evidence that Defendants utilized any of the information contained in the Discount Tire Supplemental Bid. Indeed, at the end of the TRO Hearing, Defendants agreed that it would not utilize or disclose DHL's Supplemental Bid Proposal for any business purpose. Consequently, Plaintiff has failed to show that it will suffer irreparable harm in the absence of a TRO, and this factor weighs against the issuance of the requested injunction.

## IV.

The second basis upon which Plaintiff DHL moves for a TRO is Mr. Curry's alleged violations of the restrictive covenants in his Employment Agreement.

### A. Likelihood of Success on the Merits

DHL contends that Mr. Curry violated his Employment Agreement based on the actions he took related to bidding and obtaining work from Continental Tire for its Gainesville, Georgia facility. Plaintiff DHL held that contract with Continental Tire in May 2016, when Defendants began the bid process for and ultimately won that contract. The non-solicitation and non-competition covenants in Mr. Curry's Employment Agreement ran through July 12, 2016. Because Xpedient's bid was in competition with DHL, and was solicitation of a customer of DHL, Plaintiff contends Mr. Curry violated the non-competition provision, § 5(c), and the non-solicitation of customers provision, § 5(d)(ii), of his Employment Agreement, which both contain a one year limitations period.

1. **Non-Competition Covenant**

DHL asserts that Mr. Curry violated the non-competition provision, § 5(c) of the

Employment Agreement, which provides:

> Executive [Curry] will not during employment under this Agreement and for a
> period of one (1) year after termination of employment (for any reason) compete
> with [DHL] without [DHL's] prior written consent. Executive will be deemed to
> be competing with [DHL] if Executive is self-employed as, employed by, works
> for, becomes associated with (whether as partner, officer, director, 5%
> shareholder, consultant, Executive, agent, or otherwise), furnishes information to,
> or communicates with any of [DHL]'s customers or other business associates on
> behalf of any business entity or other person listed on Exhibit A to this
> Agreement.

(Emp't Agreement § 5(c), Compl. Ex. 1, ECF No. 1-1.)

Exhibit A to the Agreement lists three DHL customers and seven DHL competitors. The

three DHL customers on Exhibit A are Discount Tire, Chrysler/Fiat, and Nissan, which are the

customers whose accounts were managed by Mr. Curry.

Plaintiff maintains that § 5(c) is violated if Mr. Curry competed with DHL during the one

year restriction period. Plaintiff asserts that "the second sentence of § 5(c) provides an example

of what is 'deemed' (i.e. considered) to be competition when acting for certain listed DHL

competitors [and] does **not** negate the blanket prohibition against competing against DHL in the

first sentence." (Pl.'s Post Hearing Brief at 18–19, ECF No. 17.) In other words, the word

"deemed" means including but not limited to.

Defendants, contrarily, posit:

> Section 5.c. of the Agreement includes two sentences, the first of which states that
> Mr. Curry cannot "compete with [DHL]," and the second of which defines
> "competing" as "furnish[ing] information to, or communicat[ing] with any of
> [DHL]'s customers or other business associates on behalf of any business entity
> or other person listed on Exhibit A to this Agreement. Section 5.d.ii., in turn,
> includes the term "competes" and states: "as that term is defined in paragraph 5(c)
> above."

15

DHL was the drafter of the Agreement, and it has defined "competes" to mean furnishing information to or communicating with its customers on behalf of an entity defined in Exhibit A to the Agreement.

(Defs.' Post Hearing Brief at 13–14, ECF No. 16.)

"Under Ohio law, the interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (citing *Parrett v. Am. Ship Bldg. Co.,* 990 F.2d 854, 858 (6th Cir.1993) (applying Ohio law); *Potti v. Duramed Pharmaceuticals, Inc.,* 938 F.2d 641, 647 (6th Cir.1991) (applying Ohio law), and *Inland Refuse Transfer Co. v. Browning–Ferris Indus. of Ohio, Inc.,* 15 Ohio St.3d 321, 474 N.E.2d 271, 272–73 (1984) ("If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined. However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary to supply the missing term.")). Contractual language is ambiguous "only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *Id.* (quoting *Covington v. Lucia,* 151 Ohio App.3d 409 (Ohio Ct. App. 10th Dist. 2003)).

The Court makes the preliminary finding that § 5(c) of the Employment Agreement is ambiguous. When the language in a contract is ambiguous, this Court generally construes it against the drafter, here DHL. *Id.* at 764 (citing *Central Realty Co. v. Clutter,* 62 Ohio St.2d 411 (1980) and *Mead Corp. v. ABB Power Generation, Inc.,* 319 F.3d 790, 798 (6th Cir. 2003) (applying Ohio law)). Moreover, "[a]ny covenant not to compete is an agreement in restraint of trade, [and] is therefore disfavored in the law, and must be construed strictly." *Single Source Packaging, LLC v. Cain*, 2003-CA-14, 2003 WL 22064129, at *6 (Ohio App. 2d Dist. Sept. 5,

2003). Accordingly, the Court finds that, at this juncture, Plaintiff has not met its burden to show that there is a strong likelihood that it will succeed on the merits of its claim that Mr. Curry violated § 5(c) of his Employment Agreement. Thus, this factor weighs in favor of denying DHL's request for a TRO.

### 2. Non-Solicitation Covenant

Paragraph 5(d) of the Employment Agreement contains a non-solicitation covenant, which has subsection (i) directed at employee solicitation and subsection (ii) directed at customers and prospective customers. The parties direct their attention to § 5(d)(ii).

As to § 5(d)(ii), Mr. Curry admits that he solicited Continental Tire's business prior to the termination of the one year limitation period to which his Employment Agreement subjects him. Defendants, however, contend that Mr. Curry did not breach the non-solicitation of customers section because (a) the business was solicited by Xpedient, not Curry, and (b) Continental Tire is not listed on Exhibit A to the Employment Agreement.

### a. Solicitation of Continental Tire

Defendants contend that "there was no testimony that during his restrictive period Mr. Curry ever solicited a customer or prospective customer of DHL to terminate or refrain from entering into a business relationship with [DHL]." (Defs.' Post Hearing Brief at 3–4.) Instead, Defendants take the position that Continental Tire's business was solicited by Xpedient. Thus, they conclude that Mr. Curry cannot be found to have violated the non-solicitation provision because he did not solicit Continental Tire's business, but rather Xpedient solicited that business. This Court disagrees.

As explanation of Mr. Curry's relationship with Xpedient, he testified at the TRO Hearing that he, Mr. White, and two other individuals formed Xpedient, which is "a third-party

logistics company focused in the automotive space." (Tr. at 45 (Curry).) It is not disputed that this is the same type of business in which DHL is engaged. Mr. Curry testified that Xpedient has been performing those services since May 2015 while Mr. Curry was still employed by DHL. (Tr. at 45–48 (Curry).) He did not inform DHL that he had formed Xpedient and began working on its behalf while still employed at DHL. (Tr. at 24–29, 37 (Curry).) Mr. Curry became the chief operating officer of Xpedient in July 2015 upon ending his employment with DHL. Messrs. Curry and White have been in majority control of Xpedient since March 2016, when the membership interests of Bret Veach, one of the other two original owners of Xpedient, were terminated. (Tr. at 3, 38–39 (Curry).) Messrs. White and Curry are also the sole directors and managers of Xpedient. (Tr. at 3, 38–39 (Curry).) When questioned about the control of Xpedient, Mr. Curry testified as follows:

> Q. Okay. Sir, after Mr. Veach left Xpedient in March of 2016 and you and Mr. White had majority ownership control, how have decisions at Xpedient been made, big picture decisions?
>
> A. John [White] and I would make those decisions.
>
> Q. The two of you collaborate on your decisions?
>
> A. I mean, I generally run the operations and John does the development, but there's some crossover.
>
> Q. And where does that crossover occur?
>
> A. When operations and development overlap.
>
> Q. My question is when does that occur?
>
> A. I mean, if we have commercial issues, if we have pursuit. I mean, there could be a varied number of reasons.
>
> Q. Pursuit. You're talking about bid proposals, right?
>
> A. Yes.

Q. Okay. So the two of you are both involved in bid proposals for Xpedient.

A. Sure.

Q. Right? And how about the strategic direction of Xpedient, do the two of you collaborate on that as well?

A. We do.

Q. And how about which customers that Xpedient is going to target for new business, do both of you collaborate on that as well?

A. John sets the targets, but I'm certainly aware of the targets.

Q. And if you say no, that would be something you would discuss and reach an agreement on?

A. Absolutely.

. . . .

Q. Okay. Sir, at Xpedient who decides -- you mentioned you're an operations guy. Who decides which operations' employees that Xpedient is going to hire?

A. That would fall under my responsibility.

Q. Okay. And who handles the customer communications at Xpedient?

A. Well, I mean, I think it really -- I mean, it really varies. I mean, we could all have some level of customer communication depending on the customer.

Q. Including when Xpedient is proposing in the bid process for new jobs or new contracts?

A. Yeah.

(Tr. at 41–43 (Curry).)

Mr. Curry's further testimony on control of Xpedient made clear that he and Mr. White solicited the Continental Tire business for Xpedient, a contract that Curry knew was held by DHL. Specifically, Mr. Curry testified that he knew Continental Tire was an existing DHL customer when he left DHL in July 2015. (Tr. at 59, 60 (Curry).) With regard to the relationship between Xpedient and Continental Tire, Mr. Curry averred that "[w]e [Xpedient] started doing

some marketing mid 2015 where we put ads in trade magazines, and John [White, Mr. Curry's business partner] began cold calling tire customers," including Continental, asking for Xpedient to be invited to bid in the future. (Tr. at 61 (Curry).) Continental Tire subsequently did invite the bid from Xpedient in May 2016, for the Gainesville, Georgia facility. (Tr. at 61, 63–64 (Curry).) Mr. Curry knew this solicitation was within the one year period of his Employment Agreement, testifying that "two months before the end of [his one year] restricted period, [he] was aware that Continental was a target" for Xpedient and that he was "involved" in putting together the bid proposal to Continental Tire for the Gainseville, Georgia facility. (Tr. at 60 (Curry).) Xpedient was successful in winning the Continental Tire contract for that facility, which had been held by DHL and which had been sought to be renewed by DHL. (Tr. at 70 (Curry).)

Therefore, the evidence presented at the TRO Hearing reflects that Mr. Curry, on behalf of Xpedient, solicited Continental Tire's business at its Gainesville, Georgia location within the one year restriction imposed by his Employment Agreement.

### b. Section 5(d)(ii) of the Employment Agreement

Plaintiff contends that the solicitation of Continental Tire's business within the one year limitations period violates § 5(d)(ii) of Mr. Curry's Employment Contract, which is directed at solicitation of customers and provides:

> Executive [Curry] will not, without [DHL's] prior written consent, during employment under this agreement or for the period specified below after termination of employment (for any reason) induce or solicit or attempt to induce or solicit,
>
> . . . .
>
> ii) for a period of one (1) year after termination of employment any existing or prospective customer of [DHL] to terminate or refrain

20

from entering into a business relationship with [DHL] and/or to enter into a business relationship with an entity or person that competes [as that term is defined in paragraph 5(c) above) with [DHL],

(Emp't Agreement § 5(d)(ii), ECF No. 1-1, Ex. 1.)

Defendants disagree that the solicitation of Continental Tire's business violates § 5(d)(ii), explaining:

Section 5(d)(ii) provided that Mr. Curry was not allowed to "induce or solicit, or attempt to induce or solicit . . . for a period of one (1) year after termination of employment any existing or prospective customer of [DHL] to terminate or refrain from entering into a business relationship with [DHL] and/or to enter into a business relationship with an entity or person that competes (as that term is defined in paragraph 5(c) above) with [DHL]."

The evidence is undisputed that Mr. Curry has never solicited any customer or prospective customer to enter into a business relationship with, or on behalf of, any of the entities listed on Exhibit A.

(Defs.' Post Hearing Brief at 3, ECF No. 16.) In other words, Defendants contend that § 5(d)(ii) prohibits solicitation only of entities that are listed on Exhibit A, which as discussed above contains a limited list of customers and competitors of DHL. Defendants therefore conclude that because Continental Tire is not listed on Exhibit A, Mr. Curry was not prohibited from soliciting its business within the one year limitation period.

On the other hand, Plaintiff contends, *inter alia*, that Defendants' interpretation "entirely ignore[s] the first sentence of the Non-Competition Covenant, which has no limitation: 'Executive will not . . . for a period of one (1) year after termination of employment (for any reason) compete with [DHL] without [DHL]l's prior written consent." (Pl.'s Post Hearing Brief at 18.) Plaintiff's arguments are well taken.

Ohio courts examine contracts in order to determine the intent of the parties, which is presumed to reside in the language of the agreement. *Textileather Corp. v. GenCorp Inc.*, 697

F.3d 378, 382 (6th Cir. 2012) (citing *Savedoff*, 524 F.3d at 763). This Court must apply the plain language of the contract unless that language is ambiguous. *Id.* And, as the Court indicated at the Final TRO Hearing, the language from § 5(d)(ii) does appear to cover Mr. Curry's conduct that was directed to Continental Tire's business at the Gainesville, Georgia facility. (Final TRO Hearing Tr. at 6–7, ECF No. 23.)

By way of explanation, the precise language used in § 5(d)(ii) provides that within the one year limitation period Mr. Curry could not "(for any reason) induce or solicit or attempt to induce or solicit . . . *any* existing or prospective customer of [DHL] to terminate or refrain from entering into a business relationship with [DHL] *and/or* to enter into a business relationship with an entity or person that competes [as that term is defined in paragraph 5(c) above) with [DHL]." (Emp't Agreement § 5(d)(ii)) (emphasis added). This provision clearly prohibits two things for a one year period. First, it prohibits solicitation of any existing or prospective DHL customer. Second, it prohibits entering into a business relationship with any person that competes as that term is defined in § 5(c) of the Employment Agreement.

Thus, the Court finds that Plaintiff has shown that it is substantially likely to succeed on the merits of its claim that Mr. Curry violated section 5(d)(ii) of the non-solicitation provision of the Agreement when he bid on the Continental Tire Gainesville, Georgia contract. However, the Court agrees with Defendants that DHL has failed to show that it will suffer irreparable harm based on its significant delay in requesting injunctive relief. (Defs.' Mot. to Dissolve TRO at 18–20, ECF No. 6.)

## B.     Irreparable Harm

The equitable doctrine of laches may prevent injunctive relief where a party has delayed the commencement of an action. *See Holmberg v. Armbrech*, 327 U.S. 392, 396 (1946). Under

Ohio law, a party invoking laches, to be successful, must show that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting the claim. *State ex rel. Caspar v. Dayton*, 53 Ohio St.3d 16, 20 (1990); Black's Law Dictionary (10th ed. 2014) ("The doctrine of laches … is an instance of the exercise of the reserved power of equity to withhold relief otherwise regularly given where in the particular case the granting of such relief would be unfair or unjust.") (citing William F. Walsh, *A Treatise on Equity* 472 (1930)).

Defendants rely upon *Crestmont Cadillac Corp. v. Gen. Motors Corp.*, No. 83000, 2004 WL 229127 (Ohio Ct. App. 8th Dist. Feb. 5, 2004), *as amended nunc pro tunc* (Feb. 10, 2004), to support their position that DHL has slept on its rights and cannot therefore show irreparable harm. The *Crestmont Cadillac* court found that the plaintiff could not show irreparable harm sufficient to obtain emergency injunctive relief because it waited nine months to seek the relief, explaining:

> The evidence at the hearing indicated that Crestmont was aware of the plans for the relocation of Classic as early as February 2002. Crestmont should not be permitted to delay seeking an injunction thereby increasing the harm Classic would suffer from such an injunction, when the degree of harm would have been less severe had Crestmont actively sought an injunction sooner. For the trial court to grant an injunction when Classic is already an operating business, in which Brown had invested millions of dollars, would be inequitable.

*Id.* at *5 (noting that " 'the doctrine of laches would militate against granting an injunction here [because] [l]aches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action' ") (citations omitted).

Similarly, in the case at bar, the evidence at the hearing indicated that at least by November 2016, DHL knew that it lost the Continental Bid to Xpedient. (Tr. at 123 (Lutwen).) It also knew that the date the bids were accepted for the Continental work was in May or June of

2016. (Tr. at 123 (Lutwen).) Thus, at a minimum DHL knew over one year ago that Mr. Curry was competing with it for the Continental Tire contract for its Gainesville, Georgia facility.

DHL counters, however, that it did not know the extent to which Mr. Curry was involved in the solicitation of the Continental Tire business. But, DHL knew Mr. Curry was a high ranking manager when he worked for DHL. Moreover, DHL was satisfied with Mr. Curry's abilities, making it clear that it did not want Mr. Curry to leave its employment. And, even after Mr. Curry left DHL, the company reached out to him for his expertise and offered him a consulting contract at $200 an hour. So at some point, no later than November of 2016, DHL would have known that the Continental Tire contract had been procured by a company in which Mr. Curry had a significant, if not controlling, interest. DHL, however, sat on its rights and did not direct its attention toward Mr. Curry's participation in the competition for the Continental Tire contract. Not at least attempting to determine whether Mr. Curry was in violation of the restrictive covenant in his Employment Agreement for over a year given the facts of this case reflects an unreasonable delay.

DHL waited several months longer than the nine month delay the *Crestmont Cadillac* court found sufficient to make it inequitable to issue a TRO. Similar to that conclusion, this Court finds that DHL should not be permitted to delay seeking an injunction thereby increasing the harm Xpedient would suffer from such an injunction, when the degree of harm would have been less severe had DHL actively sought an injunction sooner. Consequently, the doctrine of laches prevents DHL from showing irreparable harm sufficient to obtain emergency injunctive relief. Therefore, this factor too weights against issuance of the requested TRO.

## IV.

For the foregoing reasons, the Court **DENIES** Plaintiffs' Application for a TRO (ECF

No. 10) and **DENIES AS MOOT** Defendants' Motion to Dissolve TRO (ECF No. 6).

**IT IS SO ORDERED.**

1-16-2018
_____
**DATE**

_____
**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**